IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN SKILES,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 10-2270 |
| | : | |
| **CITY OF READING, et al** | : | |
| Defendants | : | |

**M E M O R A N D U M**

**STENGEL, J.**  January 7 , 2011

Brian Skiles claims the City of Reading and numerous City of Reading officials violated his First and Fourteenth Amendment rights by unfairly enforcing City zoning rules and otherwise targeting the rental properties and restaurant he owns in downtown Reading. Defendants have filed a motion to dismiss Mr. Skiles's amended complaint. For the reasons set forth below, I will grant defendants' motion.

**I.  BACKGROUND**

After the defendants filed a motion to dismiss his original complaint, Mr. Skiles timely filed an amended complaint on August 9, 2010. In it, he sets forth detailed factual allegations concerning his claims against defendants the City of Reading, Mayor of Reading Thomas McMahon, Reading Code Administrator Brad Reinhart, Reading Code Enforcement Officer William Frymoyer, Reading Health Inspector James Sanocki, Reading Plumbing Inspector Fred Yourkavitch, Reading Building Inspector Steve

Dunkle, and City of Reading Attorney Michelle Mayfield. Mr. Skiles is the owner of multiple residential properties in Reading, and of the Scarab bar and restaurant, which also operates as Daddy's Night Club, located at 724 Franklin Street in Reading. Am. Compl. ¶¶ 12, 13.

A.  **Plaintiff's Rental Properties**

Mr. Skiles claims that, starting in 2006, Mayor McMahon and other Reading officials implemented a development plan called "Downtown 20/20" with the goal of improving the quality of life in parts of downtown Reading. Id. at ¶ 15. As part of that plan, McMahon directed Mr. Reinhart, the Code Administrator, to implement a policy to reduce the number of rental properties and/or boarding houses in Reading. Id. at ¶ 14. The majority of the units owned by Mr. Skiles were originally zoned as multi-family dwellings, but in June of 2008, City of Reading officials represented to individuals interested in purchasing certain properties from Skiles that his units were zoned as single family dwellings. Id. at ¶¶ 24-26. In February of 2009, the City arbitrarily and without prior notice re-designated certain other properties as single family units. Id. at ¶ 27.[1] Mr. Skiles claims his buildings were re-zoned because of their proximity to the proposed

---

[1] Skiles claims the City sought to: (1) redesignate Skiles's property at 18 South 10th St. as a one unit building despite prior approval for nine boarding rooms; (2) redesignate Skiles's property at 704 Franklin St. as a one unit building despite prior approval for one unit and seven boarding rooms; (3) redesignate Skiles's property at 730 Franklin St. as a one unit building despite prior approval as a three unit building; (4) redesignate Skiles's property at 114 South 8th St. as a one unit building despite prior approval for one unit and five boarding rooms. See Am. Compl. ¶ 27(a)-(d).

location of a SEPTA station in Reading and to an area Mayor McMahon has targeted for redevelopment under the "Downtown 20/20" plan. Id. at ¶ 21. Skiles claims McMahon was informed that Skiles's properties, as well as those of other rental property owners in Reading, were being issued incorrect Housing Rental Permits, and that McMahon failed to correct this error. Id. at ¶¶ 32-33.

  **B.  Plaintiff's Restaurant and Bar**

Mr. Skiles also claims the City targeted the restaurant/bar/night club he owns (hereinafter "Daddy's"). Am. Compl., ¶ 13, 35. He asserts the following facts: he has owned the deed to the building housing the restaurant and club since 1982. Id. at ¶ 36. From 2006 to 2008, another individual, Jose Perez, "acquired an option to purchase and was a party to a commercial lease for Daddy's Night Club." Id. at ¶ 38. In March of 2007, Perez applied to have the zoning permit for Daddy's transferred to Pere''s name, but Skiles applied to have it transferred back to his own name on July 15, 2008. Id. at ¶¶ 41, 43. Skiles held the liquor license for Daddy's in his own name at all times, and he maintained the appropriate health permit for Daddy's at all times until 2008. Id. at ¶¶ 40, 44. In 2008, the City of Reading failed to send him an application for a health permit renewal for Daddy's as it had in prior years. Id. at ¶ 46. Skiles attempted to apply for a health permit directly from the City's Code Enforcement Office, but was denied. Id. at ¶¶ 47, 48. On May 14, 2008, the same day he attempted to obtain the updated permit, he discovered that the City had posted a notice that Daddy's would be closed as of that date.

Id. at ¶ 49; Pl.'s Ex. E. No notice of the impending closure, of a health violation, or of any other type of violation or infraction was supplied to Skiles or to Perez prior to May 14, 2008. Am. Compl. ¶ 50, 51. On May 31, 2008, the City provided notice to Skiles that Daddy's had been closed for "failure to obtain a current Health Permit." Id. at ¶ 54; Pl.'s Ex. F.

Skiles did not obtain a zoning permit for Daddy's until July 15, 2008 (the same day he applied to have the zoning permit for Daddy's transferred back from Perez's name to his own). Am. Compl. ¶¶ 43, 59. On July 16, 2008, code inspectors appeared at Daddy's to inspect the property. Id. at ¶¶ 59, 62; Pl.'s Ex. G. They told Skiles that all cited health violations would have to be corrected before the health permit would be issued. Am. Compl. ¶ 66. On August 20, 2008, Skiles received an official eight page notice citing violated portions of the building code. Id. at ¶¶ 64, 65; Pl.'s Ex. H. After receiving the notice, Skiles contacted the Code Enforcement Office and was told that if he wanted to speak with City officials, he would need to wait until a meeting could be scheduled. Am. Compl. ¶ 70. Mr. Skiles requested a meeting, which took place on October 6, 2008. Pl.'s Ex. I. After further communication between Mr. Skiles's attorney and city officials including Ms. Mayfield, a health permit for Daddy's was ultimately issued in December of 2009. Am. Compl. ¶ 73.

Skiles claims the City targeted Daddy's for unfair code enforcement because it caters to homosexuals. Id. at ¶¶ 74-77. He states that "[u]pon information and belief,

[defendants Reinhart and Frymoyer] harbor great personal animosity against homosexuals, in general, and Plaintiff, in particular." Id. at ¶ 74. As evidence of a "persuasive astrosphere hostility [sic] against homosexuals" by the City of Reading Code Enforcement Office and Property Maintenance Division, he cites a 2006 comment made by Plumbing Inspector Yourkavitch that Skiles is a "fagot."

### C. Complaint

In his amended complaint, Skiles asserts three counts, each against all named defendants. Count I is a cause of action pursuant to 42 U.S.C. § 1983 for violation of the First Amendment right to freedom of association. He claims defendants retaliated against him for exercising this right by attempting to shut down Daddy's and crippling Skiles's economic viability by rendering him unable to own and operate his rental units. Count II of Skiles's complaint asserts a claim pursuant to 28 U.S.C. § 1983 based on defendants' alleged violation of his Fourteenth Amendment due process rights. Specifically, he claims he was "treated differently than similarly situated owners of investment real property or businesses in the City of Reading." Am. Compl. at ¶ 96. In Count III of his complaint, Skiles claims defendants engaged in a conspiracy to violate his civil rights and to retaliate against him in their implementation of the Downtown 20/20 plan.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure

examines the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The factual allegations must be sufficient to make the claim for relief more than just speculative. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all plausible inferences in favor of the plaintiff. Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

It remains true that the Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which he bases his claim. Rather, the Rules require "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must, however, "allege facts suggestive of [the proscribed] conduct," Twombly, 550 U.S. at 564, and it must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556). Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995).

In assessing the merits of a motion to dismiss, courts must be careful to recognize that their duty to accept allegations as true does not apply to legal conclusions. See

Ashcroft v. Iqbal, - - U.S. - -, 129 S.Ct. 1937, 1949 (2009). "[O]nly a complaint that states a *plausible* claim for relief survives a motion to dismiss." Id. at 1950 (emphasis added). In recognition of these principles, courts must first identify those allegations in a complaint that are mere conclusions and are not entitled to the assumption of truth and then consider whether the complaint's factual allegations plausibly suggest an entitlement to relief. Iqbal, 129 S.Ct. at 1950 (emphasis added).

### III. DISCUSSION

#### A. Count I: Violation of Plaintiff's First Amendment Freedom of Association

Mr. Skiles claims, in the first count of his complaint, that all named defendants are liable under 42 U.S.C. §§ 1983 and 1988[2] for violating his First Amendment right to freedom of association by retaliating against him for engaging in protected associational activity. Specifically, he claims he engaged in protected activity by "own[ing] and operat[ing] a restaurant and bar which caters to homosexuals" and by "lodg[ing] complaints with the Office of Code Services requesting that it discharge properly its official duties and enforce City ordinances and regulations." Am. Compl. at ¶¶ 77, 78.

The defendants seek dismissal of this count for failure to state a claim upon which relief may be granted. They attest that (1) Mr. Skiles's right to own and operate a bar and

---

[2] 42 U.S.C. Section 1988 allows a prevailing party in a Section 1983 action to seek attorney's fees.

restaurant which caters to homosexuals is not protected by the constitution because it is a commercial enterprise, and (2) Mr. Skiles has made no allegation that he actually lodged complaints with the Office of Codes Services.

With respect to the first ground for dismissal asserted by defendants, they are correct in framing the relevant inquiry as whether Mr. Skiles was indeed engaging in activity protected by the First Amendment freedom of association by operating a bar that caters to homosexuals. Mr. Skiles has framed his First Amendment claim as one for retaliation, but in order to state a claim that defendants retaliated against a plaintiff for exercising his constitutional rights, that plaintiff must first satisfy the court that he was engaged in protected activity. See Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006) (In order to state a claim for retaliation based on the exercise of First Amendment rights, a plaintiff must allege "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.").

There are two types of association protected by the First Amendment: association based on intimate human relationships and association for engagement in protected First Amendment expressive activities, such as religion or speech. See Desi'z Pizza, Inc. v. City of Wilkes-Barre, No. 3:CV-01-0480, 2006 WL 2460881 at *26 (M.D.Pa. Aug. 23, 2006); Roberts v. United States Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d

462 (1984). As described by the Supreme Court:

> Our decisions have referred to constitutionally protected 'freedom of association' in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

Roberts, 468 U.S. at 617-618.

Intimate associations are deeply personal affiliations "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." Id. at 620. "Conversely, an association lacking these qualities — such as a large business enterprise — seems remote from the concerns giving rise to this constitutional protection." Id. Mr. Skiles has not alleged that his public restaurant and bar exclude anyone. Patrons are not connected by personal bonds and are not subject to a high degree of selectivity simply because the establishments "cater to" homosexuals. Skiles does not allege the existence of an intimate association.

Therefore, in order to earn constitutional protection, Skiles must show instead that the patrons of his restaurant and bar are engaged in expressive association. Expressive

association occurs when individuals engage as a group in constitutionally protected activities like speech, worship, and petitioning the government for redress of grievances. Roberts, 468 U.S. at 622. Although "in a free speech case, an association's expressive purpose may pertain to a wide array of ends (including economic ends), []the embedded associational right protects only collective speech and expressive conduct in pursuit of those ends; it does not cover concerted action that lacks an expressive purpose[.]" Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 50 (1st Cir. 2005) (citing Roberts, 468 U.S. at 622, City of Dallas v. Stanglin, 490 U.S. 19, 24-25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989)).

The defendants argue that, simply by virtue of its existence as a commercial establishment, Daddy's falls outside the realm of constitutional protection. The test is somewhat more nuanced. In Stanglin, the Supreme Court addressed whether teen patrons at a dance hall that limited admission to those of a specified age group were engaged in protected expressive First Amendment activity. It reasoned:

> [The opportunities to attend a dance hall where adults are not present] might be described as 'associational' in common parlance, but they simply do not involve the sort of expressive association that the First Amendment has been held to protect. The hundreds of teenagers who congregate each night at this particular dance hall are not members of any organized association; they are patrons of the same business establishment. Most are strangers to one another, and the dance hall admits all who are willing to pay the admission fee. There is no suggestion that these patrons 'take positions on public questions' or perform any of the other similar activities described in Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S.

537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987).[3]

Stanglin, 490 U.S. at 24, 109 S.Ct. 1591. The fact that the dance hall attendees were patrons of a commercial establishment did not alone deprive them of First Amendment protection; rather, they failed to engage in protected conduct because they lacked an expressive purpose. Stated differently, activities that are purely social in nature and do not implicate moral development, community engagement, religious expression, political discourse, or some civic or cultural purpose are not deserving of constitutional protection under the line of cases defining expressive association. Stanglin, 490 U.S. at 25; Roberts, 468 U.S. at 612 (finding that the Jaycees were engaged in expressive association through "a variety of civic, charitable, lobbying, fundraising, and other activities"); Boy Scouts of Am. v. Dale, 530 U.S. 640, 649-50, 120 S.Ct. 2446. 147 L. Ed. 2d 554 (2000) (finding that the Boy Scouts engage in expressive association by performing activities directed toward the general mission of instilling values in young people); Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 444 (3d Cir. 2000) (finding that a fraternity chapter did not engage in expressive association because it never "took a public stance on any issue of public political, social, or cultural importance.").

Skiles has not claimed that either his restaurant or his bar somehow function as an organization for the purpose of engaging in political speech, activism, or any other social

---

[3] In Rotary International, the Supreme Court recognized that Rotary Clubs engage in protected expressive association by performing service activities directed towards their "basic goals of humanitarian services, high ethical standards in all vocations, good will, and peace." 481 U.S. at 548-49, 107 S.Ct. 1940.

or cultural end. Again, he asserts simply that his bar "caters to homosexuals." The controlling legal authority does not support the proposition that owning a bar that caters to a certain clientele, in and of itself, constitutes expressive activity. It is apparent from the amended complaint that Daddy's is, first and foremost, a commercial enterprise with no expressive purpose.[4] Although it may be one that attracts a particular class of individuals based on their sexual orientation, there is no allegation that it excludes others or exists for the purpose of engaging in speech, activism, worship, or any other protected First Amendment activity.

Mr. Skiles has failed to allege facts meeting the first prong of a claim for retaliation in violation of the First Amendment based on his operation of Daddy's. However, Skiles also alleges he has "a First Amendment protected right to lodge complaints with the Office of Code Services requesting that it discharge properly its official duties[.]" Am. Compl. ¶ 78. The defendants claim Skiles "does not allege that [he] actually lodged a complaint with the Office of Codes Services requesting that it discharge properly its official duties." Def.'s Mem. 11-12. Defendants are correct. A careful review of the pleadings reveals no factual allegation that Skiles ever filed a

---

[4] In his response to the motion to dismiss filed by defendants, Skiles claims he "operated Daddy's Night Club for the purpose of providing a venue for homosexual clientele." This assertion does not change the relevant legal analysis. The issue is whether the clientele at Daddy's engaged in some protected associational activity. Skiles nowhere alleges that the individuals who gathered at Daddy's did anything other than what individuals at a restaurant and bar normally do: eat, drink, and socialize. In order to qualify for First Amendment protection, Mr. Skiles must allege that his purpose in operating the bar was something other than commercial and social.

complaint with the Office of Code Services. Rather, he asserts that, after he received the Notice of Written Violations following Dadd''s closing, he contacted the "Code Enforcement Office" and was informed that he "would have to wait to get a meeting to detail the violations issued to Daddy's Night Club." Am. Compl., ¶ 70. He claims he was not granted a meeting until several months later. Id. at ¶ 71. Because these is no factual basis in the complaint for Skiles's claim that he somehow engaged in protected activity in his communications with the Code Enforcement Office, he has not stated a First Amendment freedom of association claim on this ground.

Because Mr. Skiles fails as a matter of law to assert that he engaged in protected First Amendment activity, he cannot state a claim that he was retaliated against for engaging in such activity. Therefore, the defendants' motion to dismiss Count I of his complaint will be granted.

### B. Count II: Violation of Plaintiff's Fourteenth Amendment Due Process Rights

Mr. Skiles also asserts a Section 1983 claim against all named defendants for violation of his substantive due process rights. He claims defendants deprived him of his rights to "own and operate rental property, as well as a bar that caters to homosexuals." Pl.'s Mem, 11. He asserts that defendants targeted him and his properties because of his affiliation with the homosexual community. Id. at 12. Defendants do not contest that Mr.

Skiles's property interests are protected by the Fourteenth Amendment.[5]

Both parties agree that the proper standard to apply to Mr. Skiles's due process claim is the "shocks the conscience" test articulated in County of Sacramento v. Lewis, 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L. Ed. 2d 1043 (1998). This test recognizes that due process protection is available for "only the most egregious official conduct." Id. at 845-46. Otherwise stated, executive actions that do not "transgress the outer limit of legitimate governmental action . . . do not give rise to a federal substantive due process claim." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 505 (2d Cir. 2001) (cited in Highway Materials, Inc. v. Whitemarsh Twp., 386 Fed.Appx. 251, 258 (3d Cir. 2010) (finding that plaintiff did not establish a substantive due process violation where it "failed to demonstrate that the Board's re-zoning of [its] property and denying its proposal were unrelated to any legitimate government interest.")). The test is, however, a flexible standard that "varies depending on the factual context." United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir. 2003).

The Third Circuit, in applying this test to zoning and land-use disputes, has repeatedly observed that doing so prevents a federal court from being "cast in the role of a 'zoning board of appeal.'" See, e.g., id. at 402. "Land-use decisions are matters of local

---

[5] "To prevail on a substantive due process claim under § 1983, a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." Woodwind Estates Ltd. v. W.J. Gretkowski, et al., 205 F.3d 118, 123 (3d. Cir. 2000). Use and enjoyment of owned property are interests protected by substantive due process. DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 600-01 (3d Cir. 1995).

concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." Id. In Eichenlaub v. Township of Indiana, 385 F.3d 274, 285-86 (3d Cir. 2004), the court ruled that a substantive due process claim did not arise where officials unfairly applied zoning requirements, improperly increased tax assessments, delayed permits and approvals, and maligned the plaintiffs. It reiterated that only the grossest official misconduct can "shock the conscience," providing as examples cases where officials engaged in corruption, self-dealing and fraudulent conversion of thousands of dollars, (citing Conroe Creosoting Co. v. Montgomery Cnty., 249 F.3d 337 (5th Cir. 2001)), used their authority to target a business solely out of hostility towards its engagement in constitutionally-protected activity on the premises, (citing Assocs. in Obstetrics & Gynecology v. Upper Merion Twp., 270 F. Supp. 2d 633 (E.D.Pa. 2003)), or took adverse action out of "some bias against an ethnic group." Id. at 286.

Even accepting all the allegations in Mr. Skiles's complaint as true, he fails to state a cause of action for violation of his substantive due process rights through conduct that shocks the conscience. Mr. Skiles asserts that City of Reading officials issued improper health violations to Daddy's and then delayed issuing it a health permit, changed zoning classifications for his rental properties, and changed use restrictions for a parking lot. It is clear that these are land use and zoning actions that, in and of themselves, do not shock the conscience. See Eichenlaub, 385 F.3d at 285-86; Highway Materials, 386 Fed.Appx.

at 258 (finding that even if defendant Township officials refused to cooperate with the plaintiff, improperly applied Township ordinances, treated plaintiff differently than nearby property owners, and actively sought reasons to deny plaintiff the opportunity to develop land, those actions "simply do not shock the conscience."); DB Enterprise Developers & Builders, Inc. v. Micozzie, Slip Copy, 2010 WL 3610182 (3d Cir. Sep. 17, 2010) (affirming District Court's order granting motion to dismiss plaintiff's substantive due process claim where plaintiff claimed defendants threatened it into performing sewage work in exchange for development rights). Mr. Skiles argues that Reading officials engaged in activity similar to that of the defendants in Eichenlaub and Highway Materials, however, he does not allege fraud, self-dealing, corruption or any violation of his property rights that could be described as a taking.

Rather, it appears Mr. Skiles bases his substantive due process claim on the argument that the motivation behind defendants' actions — "impermissible discriminatory animus"— was so improper as to shock the conscience. Pl.'s Resp., 17 (citing Maple Props., Inc. v. Twp. of Upper Providence, 151 Fed.Appx. 174 (3d Cir. 2005)). However, the allegations in his complaint, if considered together and accepted as true, reveal that to the extent City of Reading officials altered zoning requirements for his properties, it was out of a governmental interest in revitalizing the area in which those properties — multi-unit dwellings and boarding houses — were located. His complaint also acknowledges that, insofar as his rental properties received incorrect housing rental

permits, other property owners in his area received the same treatment. See Am. Compl. ¶ 8. Mr. Skiles also avers that defendants targeted his restaurant and bar because, as an establishment that catered to homosexuals, it did not "fit in" with their revitalization plan. Am. Compl. ¶ 102. This allegation simply does not stand up in light of the remaining facts set forth in his complaint, which avers that City officials articulated a number of health violations for Daddy's, indicated that Daddy's would be issued a health permit once the violations were addressed, and then indeed allowed Daddy's to re-open after those violations were addressed. See Pl.'s Ex. H, Notice of Written Violation; Am. Compl. ¶ 73. The factual averments in Mr. Skiles's complaint, and the exhibits attached thereto, simply do not support any inference that City officials targeted Daddy's purely based on a discriminatory motive. The complaint avers that City officials identified health violations and then allowed Daddy's to re-open after the violations were addressed. Taking all allegations as true, City officials may have had an improper purpose in failing to timely assist Mr. Skiles in correcting the health violations or even in issuing the health violations in the first place, but they ultimately assisted him in addressing the violations and then issued a health permit allowing Daddy's to re-open. Under no set of circumstances would these allegations support a claim that, in conscience-shocking fashion, City officials targeted Daddy's out of hostility towards its homosexual clientele. Had Daddy's truly been a target for no reason other than its homosexual clientele, the City would not have allowed for its re-opening after Mr. Skiles remedied the identified

health violations.

Federal courts are not to intervene in municipal zoning disputes arising out of improperly motivated official actions. Rather, a federal claim only exists where a plaintiff alleges municipal behavior that shocks the conscience. In this case, Mr. Skiles alleges that City of Reading officials re-zoned his properties from multi-family to single-family dwellings as part of an effort to revitalize a downtown area, and then issued health violations that resulted in the temporary closing of his restaurant and bar. Even if some of these actions arose of an improper motive, none had a result that can properly be characterized as shocking the conscience.

### C.     Count III: Conspiracy to Violate Plaintiff's Civil Rights

"To state a section 1983 conspiracy claim, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a depravation of civil rights in furtherance of the conspiracy by a party to the conspiracy." <u>Marchese v. Umstead</u>, 110 F. Supp. 2d 361 (E.D.Pa. 2000) (internal citation omitted). Because Mr. Skiles has failed to allege a set of facts supporting his constitutional claims, there can be no liability on the part of any named defendants for such violations.

## IV.    CONCLUSION

For the reasons set forth above, I will grant defendants' motion to dismiss Mr. Skiles's amended complaint.